UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------x

BALAYLA AHMAD,

                     ECF Case

          Plaintiff,

     -against-                        Case No._____

UNIVERSITY OF BRIDGEPORT, NEIL ALBERT
SALONEN, an individual and in his official capacity
as President, FRANK ZOLLI, an individual and in his
official capacity as Dean of the College of Chiropractic,
APRIL VOURNELIS, an individual and in her
official capacity as Director of Security, and MICHAEL
BROMLEY, an individual and in his official capacity
as Assistant to the President,

          Defendants.

------------------------------------------------------------------x

## COMPLAINT

       Plaintiff, Balayla Ahmad, by her attorneys, Conover Offices, for her complaint against

defendants, University of Bridgeport, Neil Albert Salonen, an individual and in his official

capacity as President, Frank Zolli, an individual and in his official capacity as Dean of the

College of Chiropractic, April Vournelis, an individual and in her official capacity as Director of

Security, and Michael Bromley, an individual and in his official capacity as Assistant to the

President (collectively "defendants"), respectfully alleges as follows:

## NATURE OF ACTION

       1.      This is an action for injunctive relief and damages against defendants for

discrimination on the basis of gender and retaliation in violation of Title IX of the Education

Amendments of 1972, 20 U.S.C. § 1681-1688 (1988) ("Title IX"); and discrimination on the

basis of race, color and national origin and retaliation in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI") and the Civil Rights Act of 1871, as amended in 1991, 42 U.S.C. § 1981 *et seq*., ("Section 1981") and common law claims of breach of contract, negligence and fiduciary duty.

## JURISDICTION AND VENUE

2.      The first and second claims on behalf of the plaintiffs arise under 20 U.S.C. § 1681, et seq.; the third and fourth claims arise under 42 U.S.C. § 2000d and the fifth and sixth claims arise under 42 U.S.C. § 1981.

3.      Federal jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1343(3), and 1343(4) and Court's pendent jurisdiction is invoked for the claims arising under state statutory and/or common law.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b). These claims arose, and the defendant Bridgeport University is located, in Bridgeport, Connecticut, which is within the jurisdiction of this court.

5.      Defendant, Bridgeport University, is a private university of higher education which receives substantial federal financial assistance and benefits and is subject to the requirements of Titles VI and IX.

## ADMINISTRATIVE PROCEEDINGS

6.      On or about May 15, 2009, more than 180 days ago, plaintiff, Balayla Ahmad, filed a timely complaint alleging sexual harassment and discrimination on the basis of gender, discrimination based on race and color, and retaliation under Titles IX and VI with the United States Department of Education Office of Civil Rights ("OCR").

2

7.      OCR assigned a reference number 01-09-2030 and commenced an investigation of the alleged discrimination and retaliation against plaintiff by defendant.

## PARTIES

8.      Plaintiff, Balayla Ahmad ("plaintiff" or "Ahmad"), is a citizen of the United States and currently resides in Scottsdale, Arizona.

9.      Defendant, Bridgeport University ("the University") is an educational institution chartered by the Governor of Connecticut and grants both undergraduate and postgraduate degrees in a variety of subjects, with its principal place of business at 126 Park Avenue, Bridgeport, Connecticut.

10.      Defendant, Neil Albert Salonen ("Salonen"), is a Caucasian male citizen of the United States and, upon information and belief, resides in the County of Fairfield and State of Connecticut and, at all relevant times, was President of the University.

11.      Defendant, Frank Zolli ("Zolli"), is a Caucasian male citizen of the United States and, upon information and belief, resides in the County of Fairfield and State of Connecticut and, at all relevant times, was Dean of the College of Chiropractic at the University.

12.      Defendant, April Vounelis ("Vournelis"), is a Caucasian female citizen of the United States and, upon information and belief, resides in the County of Fairfield and State of Connecticut and, at all relevant times, was Director of Security at the University.

13.      Defendant, Michael Bromley ("Bromley"), is a Caucasian male citizen of the United States and, upon information and belief, resides in the County of Fairfield and State of Connecticut and, at all relevant times, was Assistant to the President and Title IX Officer at the University.

## FACTS

14.     After receiving her Masters degree from Central Michigan University, Ahmad, on or about August 2008, enrolled at Bridgeport University School of Naturopathic Medicine, and later, on or about January 2009, transferred to Bridgeport University's College of Chiropractic ("the College").

15.     An African American female and an observant Muslim, Ahmad regularly wore a hijab, the head covering traditionally worn by Muslim women.

16.     Shortly after her transfer, beginning on or about February 2009 through April 2009, Ahmad was subject to repeated, severe, persistent and unwelcome sexual advances and harassment by a male student, Fritz Mesilien ("Mesilien"), who was in Ahmad's classes and the College's only study group.

17.     Upon information and belief, Mesilien was a former Marine, identified himself with a "bail bondsman" business card, and had a license to carry firearms.

18.     Mesilien's sexual harassment of Ahmad included, but is not limited to, the following statements and conduct:

      a)     Beginning on or about February 11, 2009, Mesilien made sexual advances towards Ahmad. Ahmad declined Mesilien's advances and immediately advised him that she had a boyfriend.

      b)     Shortly after, Ahmad overheard Mesilien stating to another student in the study group, Moussa Sylla ("Sylla"), that, if necessary, he would convert to Islam, and that he was "getting with Layla [Balayla Ahmad]."

      c)     Shortly after, Mesilien approached Ahmad in front of the study group and whispered sexually offensive statements, including: "when am I going to

4

get a chance to bone you" and "I want to eat the bush." A student in the study group overheard the comments and expressed shock and disapproval.

d)      On or about February 16, 2009, while students were waiting for a class to begin and later during the study group, Mesilien continued to make sexual advances towards Ahmad stating: "can I come by? Why can't I stop by [referring to Ahmad's apartment]," and, when Ahmad declined his advances, he stated: "I'm going to pound that pussy and I am going to fuck you!" When Ahmad voiced her disapproval of the sexual advances, Mesilien responded: "I don't drink, I don't smoke or gamble, but my weakness is women, when I see a woman I want to fuck her."

e)      On another occasion, when the study group met at a Subway restaurant, Mesilien stated to Ahmad, in loud voice so everyone in the group could hear: "I want to eat you like I am eating this sub," and then laughed.

f)      About two days later, as Ahmad was leaving a café, Mesilien, in front of other students, stated in a loud voice: "damn your ass is big Layla. Aww man . . . check out her ass!"

g)      On or about February 23, 2009, Mesilien approached Ahmad and asked "when are we going to get together one late night, trust me it would only be between me and you," an unwelcome advance that Ahmad once again declined.

h)      On or about February 24, 2009, Mesilien approached Ahmad and stated: "I don't normally like black woman but you are different. I know you

5

could keep up and could handle it," and later stated to another student: "I like white women because they will do anything."  After making those comments Mesilien took out a pair of handcuffs and threatened Ahmad: "I'm going to cuff you!" As Ahmad attempted to leave, Mesilien chased her and unsuccessfully tried to handcuff her as the other students laughed.

i)      During another study group, Mesilien questioned Ahmad, asking: "where do the fibers end in the internal wall of the majora?" and then answered his own question, stating: "I'm going to end where the fibers attach to the internal wall of your majora."  After another student cautioned Mesilien to "leave Layla alone," Mesilien, at the elevator, stated to Ahmad: "you gotta have some desire to be with other men, don't nobody want to be with just one person."

j)      On another occasion when Ahmad was on the telephone with her boyfriend during a study group, Mesilien stated to her: "Why do you have to call your boyfriend every time we are studying? That mother fucker don't deserve you."

k)      On or about March 1, 2009, when the study group was taking a food break, Mesilien asked Ahmad: "when is your boyfriend marrying you?" He said "if it were me, I would have been married to you." He stated that "he [Ahmad's boyfriend] has one more semester and I am going to get that. He is going to have to come looking for you at [Mesilien's house]."

l)      Mesilien frequently made comments, such as "you are the only girl I even know that won't give it up," "how long have you known your boyfriend, it can't be that good."

m)     On or around March 6, 2009, at the elevator in the library, Mesilien walked up to Ahmad and said: "Tell me how your boyfriend says it to you. I want to say it to you just like him."

n)      On or about March 10, 2009, Mesilien walked up to Ahmad and said: "How long has it been since you have been with Bazzy [Ahmad's boyfriend], don't tell me you don't need this shit, I'm ready to give it to you right now," and "If ever do get that chance I'm going to push it all the way in."

o)      On or about March 27, 2009, after a class, Mesilien said to Ahmad: "I can't wait until you slip just that one time with your man, I'm going to beat it up."  The same day, as Ahmad was driving home, Mesilien stuck his middle finger up out at Ahmad of the window of the car he was in. The next day he stated to Ahmad that "I stuck my finger up because I want you to know I'm going to fuck you," and then he walked off.

p)       On or around March 29, 2009, Mesilien sent Ahmad a text message saying: "I am not trying to be your boyfriend, I just want to be him when he is not there."

q)      On or about March 30, 2009, during a break from a class, Mesilien whispered to Ahmad: "I am going to have to pound your pussy" and then said "I am going to have to shoot Bazzy [Ahmad's boyfriend]."

7

r)      On or about April 6, 2009, Mesilien sent Ahmad a text message stating: "Dang where are you. . . I miss that camel toe [outline of female private parts]" Later that day he stated to Ahmad: "You know what a camel toe looks like, well that's you facing me when you have on tights. . . You need to be grounded because you are on a different planet thinking you're out of my league." When Ahmad tried to brush him off and urged him to focus on the study group, Mesilien said: "I wish you were a book right now and if you ever slip up and let me get it, I'm going to punish it! Trust me."

s)     That same day, at a class, Mesilien whispered in Ahmad's ear: "Last night you were running all over my mind, I had to bust, it would have been better if it was on you. . . . when you do slip I'm going to bust all in your face, putting me on hold, yeah I'm gonna ground that pussy. . . ." As Ahmad walked out of the class Mesilien said: "I can tell your pussy is good I'm going to eat it out raw." Mesilien then said to another student, Sylla, "let's prepare for the range Moussa [Sylla"], I'm going to have to kill that MF [referring to Ahmad's boyfriend]."

t)     On or about April 8, 2009, Mesilien yelled at Ahmad: "Please give me a chance.  I want to eat it out . . .  If you give me that one time to fuck you, you'll forget about Bazzy, I promise you that!"

u)      On or about April 9, 2009, after a class, Mesilien texted and then stated to Ahmad "When I get a chance I'm going to stick it all the way in."

8

v)     On or about April 10, 2009, in a class, Mesilien interrupted Ahmad in

class stating: "you always are asking a question, put your hand down."

Another student, Fred Fiyaz ("Fiyaz"), in the presence of the class, then

asked "Are you fucking her?" to which Mesilien responded:  "Yeah."

19.     Humiliated by the escalating and publicly displayed sexual harassment, Ahmad,
after class, warned Mesilien and Fiyaz that she would report them both for sexual harassment.

20.     In response, Mesilien screamed and threatened Ahmad, stating to her: "better not
report me . . . there are two types of sexual harassment, direct and indirect . . . I took the class so
I know!"

21.     That same day, on or about April 10, 2009, Ahmad first reported the sexual
harassment by Mesilien to Matthew Funk ("Funk"), one of Ahmad's teachers.

22.     Funk advised Ahmad that she could report it, but that the University generally
does not get rid of the students right away when such incidents occur.

23.     Later that same day, on or about April 10, 2009, Ahmad reported the sexual
harassment by Mesilien to the teacher and provost, Barry Kendler ("Kendler"), in whose class
the harassment last occurred.

24.     Kendler asked Ahmad if she was married and she responded no. He then asked
Ahmad not to report it to Zolli because Kendler would speak with Mesilien.

25.     Later that day, Ahmad reported the harassment to another student, who,
notwithstanding Kendler's advice, urged her to report the harassment to Zolli.

26.     On or about April 10, 2009, Ahmad went to Zolli's office to report the sexual
harassment, but was advised that Zolli was not in the office.

27.     Later that day, Sylla, a friend of Mesilien, called Ahmad and tried to convince her not to report the sexual harassment.

28.     When Ahmad returned to class on or about Monday, April 13, 2009, a majority of the students in the class were discussing what had happened on the prior Friday between Ahmad and Mesilien.

29.      On or about April 14, 2009, Ahmad reported the sexual harassment to another teacher, Richard Kelley ("Kelley"), who in turn reported it to another teacher, Sharon Sawitzke ("Sawitzke").

30.     Sawitzke advised Ahmad to "give it a week," not to go to Zolli right away, and that she would speak with the men in the class.

31.      On or about April 14, 2009, Ahmad e-mailed the University's President, Salonen, and the College's Dean, Zolli, and reported the sexual harassment, the hostile environment and her fear for her personal safety.

32.     On or about April 15, 2009, Ahmad, again, went to Zolli's office and, again, was told that he was off that day.

33.     Later on or about April 15, 2009, Zolli called Ahmad and advised her that he would deal with her complaint when he got back, and she then received email confirmation from Bromley, the Assistant to the President, that Zolli would meet with Ahmad on April 16, 2009.

34.     Later on or about April 15th, when Ahmad heard student friends of Mesilien beating on the desk chanting "Super Bitch! [referring to Ahmad]," she called Zolli to explain the urgency and requested an immediate meeting.

35.     Zolli declined Ahmad's request for an immediate meeting, stating: "Look if people are not going to be professional someone is going to have to go, I will see you, Layla, at 12:00 tomorrow."

36.     On or about April 16, 2009, Ahmad personally reported the sexual harassment to Zolli in his office, to which Zolli responded: "My hands are tied. What do you suggest I do?"

37.     Ahmad advised Zolli that he should speak with the teachers to whom she had previously reported the harassment and advised him that she had other witnesses, to which Zolli responded: "Yes I will speak with them . . . okay, I will see you in class."

38.     After reporting the sexual harassment to Zolli, Ahmad was approached by two unknown individuals, April Vournelis ("Vournelis") and William Horvath ("Horvath"), who she later learned were University Security Directors, who questioned whether she had reported sexual harassment "against one of our University of Bridgeport chiropractic students."

39.     When Ahmad acknowledged that she had complained about sexual harassment, Vournelis stated: "We have allegations that have been made against you and if you don't come with us we will contact the FBI."

40.     Shocked and not knowing who had approached her, Ahmad declined the command that she follow them, and Vournelis threatened: "Well, I am contacting the FBI and when you get to security we will have you arrested."

41.     Given the sexual harassment and threatening conduct by Mesilien, the failure of the University to take prompt remedial action, and Vournelis' threat that she would be arrested, Ahmad did not return to class and reported the sexual harassment to the Bridgeport Police Department.

42.     On or about April 22, 2009, Zolli's office then contacted Ahmad to schedule a meeting with Zolli on April 23, 2009.

43.     Ahmad responded by email dated April 23, 2009 confirming that she would "cooperate fully with the investigation of her complaints," but requesting that if Vournelis and Bromley were to be present at the meeting with Zolli, that it be adjourned briefly so she could retain counsel in view of Vournelis' threat that she would be arrested.

44.     The next morning, on or about April 24, 2009, two FBI agents, including Agent Katherine Sullivan ("Sullivan"), knocked on Ahmad's apartment door, questioned her and left a business card.

45.     Ahmad advised Sullivan that she would have the Council on American Islamic Relations ("CAIR") or her attorney contact them.

45.     By email and letter dated April 24, 2009, Ahmad, through her attorney and CAIR, advised Bromley of her continuing willingness to cooperate with the investigation, reported her concern that the University was retaliating against her by threatening her with arrest, and requesting that the University tape her classes and/or provide an offsite proctor for her examinations so that her absence during the investigation would not adversely impact her academic standing.

46.     On or about April 24, 2009, Zolli advised Ahmad via email that "the College deems your [sexual harassment] complaint to be closed as to the other students" and advised that she was being referred to the "Disciplinary Committee" for "evaluation" and that "a negative evaluation may adversely affect your status at UBCC."

47.     On or about April 30, 2009, Ahmad met with Sullivan and learned that Mesilien, and/or persons associated with him at the University, had fabricated a story falsely accusing her

12

of being a terrorist in apparent retaliation for her having made a sexual harassment complaint against him.

48.     On or about May 5, 2009, Ahmad met with the University's outside counsel, Loraine Cortese-Costa, Esq. ("Cortese-Costa") and reported, again, in detail her complaint of sexual harassment and the false accusations against her.

49.     As a result of the severe and persistent sexual harassment, the University's failure to properly investigate the harassment and take prompt remedial action, and the retaliatory actions initiated by the University, including threats of federal prosecution based on fabricated accusations by the harasser and/or his associates, Ahmad was prevented from attending class and the examinations and was unable to complete the semester in safety.

50.     By letter dated June 23, 2009, the University advised Ahmad that she was "Academically Dismissed" from the University and she later received failing grades in all her classes.

51.     The defendants exhibited deliberate indifference to Ahmad's repeated complaints of severe student-on-student sexual harassment by profiling her based on her race, color, ethnicity and Muslim religion; by failing to investigate her sexual harassment complaints; by failing to take timely and appropriate remedial action.

52.     The defendants retaliated against Ahmad by recklessly disseminating false accusations by the harasser which the defendants had good reason to know were unreliable; threatening arrest and federal prosecution by the FBI; profiling Ahmad based on her race, color, ethnicity and Muslim religion; refusing to reschedule a timely meeting with Ahmad and witnesses to investigate her sexual harassment complaint; failing to afford her requested

accommodations to protect her academic standing; and issuing her failing grades and academically dismissing her from the University.

53.    Ahmad was racially profiled and discriminated against because of her race, color and ethnic identity as an African American Muslim and labeled a terrorist based on false accusations provided by the harasser and adopted without adequate investigation by the University.

54.    The individual defendants, Salonen, Zolli, Vournelis and Bromley, participated in the discrimination and retaliation and/or had the power to make personnel decisions and/or aided and abetted the discrimination and retaliation.

55.    As a result of the above, Ahmad's has suffered, and continues to suffer, severe emotional distress and humiliation.

56.    As a result of the above, Ahmad has suffered, and continues to suffer, significant financial losses in that she has lost her tuition and living expenses at the University and is unable to enroll in another University or secure employment in her profession given the damage to her academic standing.

## FIRST CLAIM FOR RELIEF
## GENDER DISCRIMINATION IN VIOLATION OF TITLE IX

57.    Plaintiff repeats and realleges each and every allegation of paragraphs 1- 56 with the same force and effect as if set forth in full herein.

58.    20 U.S.C. § 1681 states: "No person in the United States shall, on the basis of sex, be subjected to discrimination under any educational program or activity receiving Federal financial assistance."

59.     The intentional conduct of defendants towards plaintiff has resulted in plaintiff being subjected to gender discrimination and sexual harassment while she was a student at the University.

60.     Upon information and belief, the University receives federal financial assistance.

61.     The University and the individual defendant school officials failed to take necessary and appropriate actions to prevent plaintiff from being subjected to discrimination on the basis of sex.

62.     Defendants were recklessly and deliberately indifferent to acts of student-on-student harassment reported by plaintiff.

63.     Defendants, by failing to prevent plaintiff from being subjected to sexual harassment and discrimination on the basis of sex, violated the requirements of 20 U.S.C. §1681.

## SECOND FIRST CLAIM FOR RELIEF
## RETALIATION IN VIOLATION OF TITLE IX

64.     Plaintiff repeats and realleges each and every allegation of paragraphs 1- 63 with the same force and effect as if set forth in full herein.

65.     The defendants retaliated against Ahmad for complaining about sexual harassment by recklessly and deliberately disseminating false accusations against her by the harasser which the University had good reason to know were unreliable; threatening arrest and federal prosecution by the FBI; profiling her based on her race, color, ethnicity and Muslim religion; refusing to reschedule a timely meeting with Ahmad and witnesses to investigate her sexual harassment complaint; failing to afford her requested classroom and examination accommodations to protect her academic standing; and issuing her failing grades and academically dismissing her from the University.

15

66.     Defendants, by retaliating against Ahmad for reporting the sexual harassment, violated the requirements of 20 U.S.C. § 1681.

### THIRD CLAIM FOR RELIEF
### RACE, COLOR AND NATIONAL ORIGIN DISCRIMINATION
### IN VIOLATION OF TITLE VI

67.     Plaintiff repeats and realleges each and every allegation of paragraphs 1- 66 with the same force and effect as if set forth in full herein.

68.     Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

69.     The intentional conduct of defendants towards plaintiff has resulted in plaintiff being subjected to discrimination on the basis of race, color, or national origin while she was a student at the University.

70.     Because of Ahmad's race, color, or national origin, defendants were deliberately and recklessly indifferent to her sexual harassment complaints; disseminated false accusations against her by the harasser which the University had good reason to know were unreliable; threatened arrest and federal prosecution by the FBI; profiled her based on her race, color, ethnicity and Muslim religion; refused to reschedule a timely meeting with Ahmad and witnesses to investigate her sexual harassment complaint; failed to afford her requested classroom and examination accommodations to protect her academic standing; and issued her failing grades and academically dismissed her from the University.

71.     Defendants, by failing to provide plaintiff an educational environment free from racial harassment and intimidation, violated Title VI of the Civil Rights Act of 1964.

16

72.     Defendants, by discriminating against plaintiff on the basis of race, color and national origin, violated the requirements of 42 U.S.C. § 2000d.

## FOURTH CLAIM FOR RELIEF
## RETALIATION IN VIOLATION OF TITLE VI

73.     Plaintiff repeats and realleges each and every allegation of paragraphs 1- 72 with the same force and effect as if set forth in full herein.

74.     The defendants retaliated against Ahmad for complaining about race, color and national origin discrimination by recklessly and deliberately disseminating false accusations against her by the harasser which defendants had good reason to know were unreliable; threatening arrest and federal prosecution by the FBI; profiling her based on her race, color, ethnicity and Muslim religion; refusing to reschedule a timely meeting with Ahmad and witnesses to investigate her sexual harassment complaint; failing to afford her requested classroom and examination accommodations to protect her academic standing; and issuing her failing grades and academically dismissing her from the University.

75.     Defendants, by retaliating against Ahmad for reporting the race, color and national origin discrimination, violated the requirements of 20 U.S.C. § 1681.

## FIFTH CLAIM FOR RELIEF
## RACE, COLOR AND ETHNICITY DISCRIMINATION IN VIOLATION OF §1981

76.     Plaintiff repeats and re-alleges the allegations in paragraphs 1- 75 as if fully set forth herein.

77.     Defendants intentionally discriminated against Ahmad because of her race, color and ethnicity as an African American Muslim, by recklessly and deliberately disseminating false accusations against her by the harasser which defendants had good reason to know were unreliable; threatening arrest and federal prosecution by the FBI; profiling her based on her race,

17

color, ethnicity and Muslim religion; refusing to reschedule a timely meeting with Ahmad and witnesses to investigate her sexual harassment complaint; failing to afford her requested classroom and examination accommodations to protect her academic standing; and issuing her failing grades and academically dismissing her from the University.

78.    As a result of defendants' willful, knowing and intentional discrimination, plaintiff sustained substantial losses in earnings and other educational and employment benefits, future pecuniary losses and has suffered and continues to suffer humiliation, mental and physical distress and anguish.

## SIXTH CLAIM FOR RELIEF
## RETALIATION IN VIOLATION OF § 1981

79.    Plaintiff repeats and realleges each and every allegation of paragraphs 1- 78 with the same force and effect as if set forth in full herein.

80.    The defendants retaliated against Ahmad for complaining about race, color and ethnicity discrimination by recklessly and deliberately disseminating false accusations against her by the harasser which defendants had good reason to know were unreliable; threatening arrest and federal prosecution by the FBI; profiling her based on her race, color, ethnicity and Muslim religion; refusing to reschedule a timely meeting with Ahmad and witnesses to investigate her sexual harassment complaint; failing to afford her requested classroom and examination accommodations to protect her academic standing; and issuing her failing grades and academically dismissing her from the University.

81.    As a result of defendants' willful, knowing and intentional retaliation, plaintiff sustained substantial losses in earnings and other educational and employment benefits, future

18

pecuniary losses and has suffered and continues to suffer humiliation, mental and physical distress and anguish.

**SEVENTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT**

82.     Plaintiff repeats and realleges each and every allegation of paragraphs 1- 81 with the same force and effect as if set forth in full herein.

83.     In consideration for payment of tuition, the University provided Ahmad with admissions literature and matriculation material setting forth specific express and implied contractual promises and policies concerning the educational environment that would be afforded Ahmad at the University.

84.     The University, in its General Information Handbook ("University Handbook"), in pertinent part at page 25, provided that the University does not "tolerate discrimination on the basis of gender, sexual orientation, race, color, religion, age, national or ethnic origin, creed, political affiliation, or handicap."

85.     The University, in its College of Chiropractic Student Handbook ("College Handbook"), in pertinent part at Chapter 4, provided that "[a]ny form of harassment" or "discrimination based on an individual's or group's race, gender, ethnicity, religion, age, disability, sexual orientation or other differences will not be tolerated," and provided that any such reported discrimination or harassment would be investigated by the University's Title IX Officer and that corrective action would be taken.

86.     The University and College Handbooks constituted an express or implied contract that Ahmad would be afforded an educational environment free from sexual harassment and free from gender, race, color, ethnicity and religious discrimination.

19

87.     The University and College Handbooks constituted an express or implied contract that, if Ahmad reported sexual harassment, confidentiality would be maintained, a timely investigation and hearing would be conducted by the Title IX officer, prompt remedial action would be taken, and she would be protected from retaliation.

88.     In accordance and in reliance on the University and College Handbooks, Ahmad reported the sexual harassment to the harasser, her teachers, the College Dean, the University President and the University Title IX Officer.

89.     In breach of the University and College Handbooks, the University failed to maintain confidentiality, failed to timely investigate her report, failed to conduct a hearing, and failed to take timely remedial action.

90.     In breach of the University and College Handbooks, the University retaliated and discriminated against Ahmad based on her gender, race, color, ethnicity and religion; failed to timely investigate the sexual harassment complaint; failed to maintain confidentiality; failed to take timely remedial action; profiled her based on her race, color, ethnicity and Muslim religion; threatened her with arrest by the FBI; falsely reported her as a suspected terrorist to the FBI; refused to provide her with accommodations necessary for her to safely complete her academic course work and examinations; failed her in all her classes; and academically dismissed her from the University.

91.     As a result of the University's breach of contract, Ahmad has suffered significant losses of tuition, living expenses and income.

**EIGHTH CLAIM FOR RELIEF**
**NEGLIGENCE**

92.     Plaintiff repeats and realleges each and every allegation of paragraphs 1- 91 with the same force and effect as if set forth in full herein.

93.     In accord with the University and College Handbooks, the defendants owed Ahmad an educational environment reasonably free from sexual harassment and discrimination based on her gender, race, color, ethnicity, and religion.

94.     The defendants were negligent in responding to Ahmad's report of sexual harassment by failing to timely investigate the sexual harassment complaint; failing to maintain confidentiality; failing to take timely remedial action; profiling her based on her race, color, ethnicity and Muslim religion; threatening her with arrest by the FBI; reporting her as a suspected terrorist to the FBI; refusing to provide her with accommodations necessary for her to safely complete her academic course work and examinations; failing her in all her classes; and academically dismissing her from the University.

94.     The defendants were negligent in the supervision and training of its staff, including but not limited to it President, Deans, Faculty, Title IX Officer and Security Directors with respect to the implementation and enforcement of the University and College Handbooks.

95.     The defendants' negligence caused Ahmad to be injured and to suffer severe economic and emotional distress damages.

**NINTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY**

96.     Plaintiff repeats and realleges each and every allegation of paragraphs 1-95 with the same force and effect as if set forth in full herein.

21

97.     The defendants were in a position of power and authority over Ahmad and in a position of trust and confidentiality with regard to her education.

98.     The defendants had a fiduciary duty toward Ahmad to provide a safe educational environment free from sexual harassment and free from gender, race, color, ethnicity and religious discrimination.

99.     The defendants breached their fiduciary duty owed to Ahmad by failing to timely investigate the sexual harassment complaint; failing to maintain confidentiality; failing to take timely remedial action; profiling her based on her race, color, ethnicity and Muslim religion; threatening her with arrest by the FBI; reporting her as a suspected terrorist to the FBI; refusing to provide her with accommodations necessary for her to safely complete her academic course work and examinations; failing her in all her classes; and academically dismissing her from the University.

        **WHEREFORE,** plaintiff respectfully requests that this Court enter judgment in plaintiff's favor and against defendants:

A.      A declaratory judgment that the actions, conduct and practices of defendants complained of herein violate the laws of the United States;

B.      An injunction and order permanently restraining defendants from engaging in such unlawful conduct;

C.      An order directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful educational practices are eliminated, including but not limited to reinstatement and restoring plaintiff's good academic standing;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all monetary and/or economic damages, including but not

limited to, the loss of tuition and living expenses, past and future income, wages, compensation, and other benefits;

   E.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries;

   F.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

   G.  An award of damages for any and all other monetary and/or non-monetary losses suffered by plaintiff in an amount to be determined at trial, plus prejudgment interest;

   H.  An award of punitive damages;

   I.  An award of costs that plaintiff has incurred in this action, as well as plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

   J.  Such other and further relief as the Court may deem just and proper.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**
**ON ALL CLAIMS FOR RELIEF**

Dated: New York, New York
   January 10, 2012

          CONOVER LAW OFFICES
          Attorneys for Plaintiff

       By:  _____s/_____
          Bradford D. Conover, Esq.
          75 Rockefeller Plaza (20th Fl.)
          New York, NY  10019
          (212) 588-9080
          brad@conoverlaw.com